UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CALVIN LEE GODDARD,

    Plaintiff,

V.

NICK ALEXAKOS, et al.,

    Defendant.

Civil Action No. 5: 16-215-KKC

**MEMORANDUM OPINION AND ORDER**

\*\*\* \*\*\* \*\*\* \*\*\*

Inmate Calvin Goddard is confined at the Federal Medical Center in Lexington, Kentucky (FMC-Lexington). Proceeding without counsel, Goddard filed a lawsuit against numerous federal prison officials alleging violations of his constitutional and statutory rights to practice his religion. [R. 1] This matter is now before the Court for screening pursuant to 28 U.S.C. § 1915A. For the reasons set forth below, the Court will dismiss some of Goddard's claims and also dismiss some of the defendants from the case. The Court will then direct that summons be issued to the remaining defendants so that they can respond to the outstanding claims.

I.

According to Goddard, he is a member of "The Way," which he describes as a non-Protestant Christian religion. [R. 1, 1-1] Goddard claims that while officials at FMC-Lexington allow other religious groups to access and hold their services at the prison's chapel, the officials have prevented members of The Way from worshipping as a group at the chapel. [R. 1 at 13-14]. While Goddard acknowledges that the prison offers general Christian services, he argues that those services are Protestant in nature, and he repeatedly emphasizes that he is not a Protestant. In fact,

throughout Goddard's complaint and attached exhibits, he goes to great lengths to distinguish his own faith from Protestantism.

In April 2015, Goddard submitted a request through the prison's administrative process, formally asking "to no longer be designated in Sentry as Protestant" and requesting that The Way be permitted to hold its own non-Protestant religious service at the prison on Sunday evenings. [R. 1-1 at 2-9]. Goddard also requested "a non-protestant choir, an acceptable time to practice, to have our own guest speakers, [and] to have guest choirs (on occasion)," as well as certain items for the religious services. [R. 1-1 at 9]

The prison's Religious Issues Committee met and considered Goddard's request. [R. 1-1 at 13, 18] In response, a supervisory chaplain and the warden both wrote to Goddard and told him, "The Religious practices described in this request are typically accommodated in the General Christian services, often referred to as Protestant." [R. 1-1 at 13, 18]. That said, they also indicated that members of The Way could be "accommodated as individual practitioners" who could "procure religious study material" and also "have access to clergy visits from their spiritual leader." [R. 1-1 at 13, 18]. Finally, the supervisory chaplain and warden informed Goddard that if he "does not wish to be listed in Sentry with a religious preference of 'Protestant,' an appropriate alternative could be 'Other.'" [R. 1-1 at 13, 18].

Goddard was not satisfied with this response. [R. 1 at 6]. As an initial matter, Goddard appeared to raise some procedural concerns about the Religious Issues Committee's meeting. [R. 1 at 6]. Goddard also objected to the substance of the response, arguing again that the general Christian services are Protestant in nature and, therefore, inconsistent with his religious beliefs, and that members of The Way should be permitted to worship as a group in the chapel. [R. 1 at 6; R. 1-1 at 16-17, 20].

After exchanging correspondence with some of the chaplains at the prison, it appears that Goddard at least began to pursue his administrative remedies. Indeed, Goddard attached to his complaint several documents related to a formal administrative review process. [R. 1-1 at 28-48]. During that process, the warden responded to the request for an administrative remedy by telling Goddard, "A review of your request has revealed numerous worship and study times for the General Christian faith tradition which you are part of." [R. 1-1 at 31]. The warden later said, "Adding another General Christian Service would give General Christian's substantially more time than other faith groups. A lack of equitability in the allotment of time given to each faith group could lead to a disruption in the smooth orderly running of the institution and cause significant safety concerns." [R. 1-1 at 31]. Finally, the Warden told Goddard, "If you find the current General Christian worship and study times do not meet your religious needs completely, you may practice your religion as an individual practitioner and may have a Minister of Record." [R. 1-1 at 31].

After receiving the warden's response, it appears that Goddard may have pursued his administrative remedies through the appeals process. Indeed, there are receipts in the record suggesting that Goddard appealed the warden's response to the Bureau of Prison's (BOP's) regional and central offices. [R. 1-1 at 32, 40-42]. However, the record is not altogether clear on this point. That is because the dates and remedy ID numbers on the correspondence between Goddard and prison officials are at times inconsistent. [R. 1-1 at 28-51]. It also appears that the issues in the present matter became intertwined with separate allegations that Goddard may have raised in the past, including a racial discrimination claim related to a Protestant choir at the prison. [R. 1-1 at 35-36, 50-51]. In any event, Goddard claims that he sent multiple forms to numerous prison and law enforcement officials, and he has not received a response to date. [R. 1 at 10].

Goddard then filed this lawsuit in federal court against numerous prison officials in both their official and individual capacities. Goddard again argues at length that the general Christian services offered at the prison are inconsistent with his religious beliefs and that members of The Way should be permitted to worship as a group in the chapel. [R. 1 at 11-17]. That said, Goddard also briefly states at the end of his complaint that the defendants have recently "begun to retaliate as [he] just filed another BP-9 over the fact the Chapel has refused to allow the Plaintiff and others continued use [of] the Chapel chairs for a Saturday night Bible Study that has gone on for over six years." [R. 1 at 17] On that point, Goddard alleges that the defendants "have posted a sign on the Chapel door that chairs are for Chapel sponsored events only (though others use them), and asked Officers who work that post to cease opening the Chapel and allow chairs to be used." [R. 1 at 17].[1] Ultimately, Goddard claims that "[t]he defendants have violated [his] 1st, 8th, and 14th Amendment rights by denying him the right to freely exercise his religion known originally as The Way, (Christianity)." [R. 1 at 17] Goddard also argues that the defendants have run afoul of the Religious Freedom Restoration Act (RFRA), the Religious Land Use and Institutionalized Persons Act (RLUIPA), and 18 U.S.C. § 1001. [R. 1 at 18] Goddard is seeking monetary damages and injunctive relief, including but not limited to an order that "a service be granted to The Way on Sundays comparable to other religions being allowed two hour services." [R. 1 at 22]

This matter is now before the Court for screening pursuant to 28 U.S.C. § 1915A.

II.

The Court will dismiss some of Goddard's claims and also dismiss some of the defendants from the case. The Court will then direct that summons be issued to the remaining defendants so that they can respond to the outstanding claims.

---

[1] Goddard also echoes his retaliation claim in subsequent submissions to the Court. [R. 5, 11].

As an initial matter, the Court will dismiss Goddard's claim that the defendants violated 18 U.S.C. § 1001. Section 1001, of course, is a federal statute that makes it a crime to make false statements to the federal government, and Goddard does not have the authority to invoke that statute in this civil case.

The Court will also dismiss Goddard's Eighth and Fourteenth Amendment Claims. That is because, at bottom, Goddard is alleging that federal prison officials violated the rights guaranteed him by the Free Exercise Clause. Thus, Goddard's constitutional claim—which he may bring in federal court pursuant to 28 U.S.C. § 1331 and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971)—is rooted in the First Amendment, not the Eighth or Fourteenth. And the Supreme Court has indicated that where a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that provision. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Thus, the Court will not analyze Goddard's claim under either the broad rubric of substantive due process, which is presumably what he is trying to invoke with his reference to the Fourteenth Amendment, or the Eighth Amendment's prohibition on cruel and unusual punishment, which is simply not on point in this case. Instead, the Court will dismiss those claims.

This leaves Goddard's First Amendment Free Exercise claim, RFRA claim, and RLUIPA claim. It also leaves Goddard's First Amendment retaliation claim, which he briefly makes at the end of his complaint [R. 1 at 17] and in subsequent submissions to the Court [R. 5, 11] and for which he may not have exhausted his administrative remedies. The Court will order service upon the defendants to address these four claims, which are made against them in both their official and individual capacities.

That said, before the Court directs that summons be issued, the Court will dismiss four defendants from this case: (1) C. Eichenlaub, the Former Regional Director of the BOP's Mid-Atlantic Region; (2) J.F. Caraway, the Current Regional Director of the BOP's Mid-Atlantic Region; (3) Ian Connors, the Administrator for National Inmate Appeals at the BOP (Central Office); and (4) Charles Samuels, the Former Director of the BOP. That is because it does not appear from Goddard's complaint that these current or former officials were involved in this case in any meaningful way, other than simply responding or not responding to Goddard's administrative appeals, or that they otherwise purposefully availed themselves of the forum state. As another federal court put it, "It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state." *Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003). Therefore, the Court will dismiss these four defendants from this case.

III.

Accordingly, **IT IS ORDERED** that:

1. Defendants C. Eichenlaub, J.F. Caraway, Ian Connors, and Charles Samuel are **DISMISSED** from this case.

2. The Deputy Clerk shall prepare "Service Packets" for service upon the United States of America, the Federal Bureau of Prisons, and each remaining individual defendant in this case. The Service Packets should each consist of:

   a. a completed summons form;
   b. the complaint [R. 1];
   c. the first and second amended complaints [R. 5; R. 11];
   d. this Order; and
   e. a completed USM Form 285.

3. The Deputy Clerk shall send the Service Packets to the USMS in Lexington, Kentucky and note the date of delivery in the docket.

4.	The USMS shall serve the United States of America by sending a Service Packet by certified or registered mail to the Civil Process Clerk at the Office of the United States Attorney for the Eastern District of Kentucky and to the Office of the Attorney General of the United States in Washington, D.C.

5.	The USMS shall serve the Federal Bureau of Prisons by sending a Service Packet by certified or registered mail to: (A) the Civil Process Clerk at the Office of the United States Attorney for the Eastern District of Kentucky; (B) the Office of the Attorney General of the United States in Washington, D.C; and (C) the Central Office of the Federal Bureau of Prisons in Washington, D.C.

6.	The USMS shall personally serve each individual defendant in this case at the Federal Medical Center in Lexington, Kentucky, through arrangement with the Federal Bureau of Prisons. The individual defendants are as follows:

    a.	Nick Alexakos;
    b.	Thomas Caldwell;
    c.	Dave Carpenter;
    d.	Jose Jimenez;
    e.	J.G. Hallock;
    f.	S. Lovett;
    g.	Francisco Quintana;
    h.	Chaplain Ortiz;
    i.	Officer Mundy;
    j.	S. Kern; and
    k.	FMC-Lexington Official "PLP"

7.	Goddard must immediately advise the Clerk's Office of any change in his current mailing address. **Failure to do so may result in dismissal of this case**.

8.	If Goddard wishes to seek relief from the Court, he must do so by filing a formal motion sent to the Clerk's Office. Every motion Goddard files must include a written certification that he has mailed a copy of it to the defendants or their counsel and state the date of mailing. **The**

**Court will disregard letters sent to the Judge's chambers or motions lacking a certificate of service.**

Dated April 17, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY