UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CALVIN LEE GODDARD,

     Plaintiff,

V.

NICK ALEXAKOS, et al.,

     Defendants.

Civil Action No. 5: 16-215-KKC

**MEMORANDUM OPINION
& ORDER**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Calvin Lee Goddard is an inmate confined at the Federal Medical Center in Lexington, Kentucky ("FMC-Lexington"). Proceeding without counsel, Goddard filed a civil rights complaint asserting claims under 28 U.S.C. § 1331, pursuant to the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb–1 to –4, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–1 (2000). [R. 1]. After initial screening of his Complaint by the Court [R. 21], Goddard's remaining claims allege that Defendants Nick Alexakos, Thomas Caldwell, Dave Carpenter, Jose Jiminez, J.G. Hallock, S. Lovett, Francisco Quintana, Chaplain Ortiz, Officer Mundy, S. Kern and PLP (collectively, "Defendants") have violated the RFRA and the RLUIPA. Also remaining are Goddard's retaliation and free exercise claims under the First Amendment. Goddard is seeking monetary damages and injunctive relief in the form of an order that "a service be granted to The Way on Sundays comparable to other religions being allowed two hour services." [R. 1 at p. 22].

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. [R. 36]. Goddard has filed a response [R. 38] and Defendants have filed a reply [R. 42]. Thus,

this matter has been fully briefed and is ripe for review.[1]  Also pending before the Court are

Goddard's motion to appoint counsel for discovery [R. 44] and a motion for discovery [R. 45],

which he claims are necessary in light of the motion to dismiss and, in the alternative, motion for

summary judgment filed by Defendants, as well as Goddard's motion for preliminary injunction.

[R. 39].

    For the reasons set forth below, the Court will grant Defendants' motion to dismiss or, in

the alternative, motion for summary judgment [R. 36] and dismiss Goddard's claims.

## I.    Factual Background

    According to Goddard, he is a member of "The Way," which he describes as a non-

Protestant Christian religion.  [R. 1, 1-1].  Goddard claims that, while officials at FMC-Lexington

allow other religious groups to access and hold their services at the prison's chapel, the officials

have prevented members of The Way from worshipping as a group at the chapel.  [R. 1 at p. 13-

14].  While Goddard acknowledges that the prison offers general Christian services, he argues

that those services are Protestant in nature, and he repeatedly emphasizes that he is not a

Protestant.  Indeed, throughout these proceedings, Goddard had gone to great lengths to

distinguish his own faith from what he claims are the beliefs of Protestants.  Specifically, he

objects to the participation of homosexual inmates and Catholic inmates in the general Christian

services, the use of overhead music, and the celebration of holidays.  [R. 1 at p. 12, 14-16].

Goddard repeatedly claims that only followers of The Way are "True Christians" and that,

although other religions (including what he identifies as Protestants) "claim to be Christian, they

[1] The Defendants have also filed a motion to strike Goddard's response [R. 43] because the response is 66 pages in length, which exceeds the 40-page limit provided by Local Rule 7.1(d), and because Goddard failed to obtain the Court's approval prior to filing the excessive pleading.  Goddard's response does, in fact, violate the page limitations of the Court's Local Rules.  Although striking his response would be appropriate, in the interest of efficiency and to prevent delay in resolving this matter, the Court will consider Goddard's full response in the course of reviewing this matter.  However, Goddard is warned that, notwithstanding his *pro se* status, he is still required to comply with the Court's Local Rules.

are not actually Christian, they are simply denominations that believe in Christ." [R. 1 at p. 11-12]. Based on his characterization that only followers of The Way are "true" Christians, he argues that the BOP's policies are "diametrically opposed to Christianity." [R. 1 at p. 13, 14].

To be sure, Goddard's lengthy complaint, numerous attachments and related amendments, as well as his 66-page response to Defendants' motion, touch on a plethora of issues, including the differences between the beliefs of The Way and "Protestant" religions, Goddard's suspicions regarding the beliefs and motivations of the BOP and prison officials, and Goddard's dissatisfaction with the general Christian Sunday service and with the BOP's administrative remedy process. However, as indicated by the Court's screening Order [R. 21], the only remaining claims before the Court are his claims that Defendants are improperly interfering with his rights under the free exercise clause of First Amendment, the RFRA, and the RLUIPA by failing to allow The Way to have access to and hold their own services in the prison's chapel and that Defendants have retaliated against him for exercising his First Amendment rights.

Defendants' motion [R. 36] argues that Goddard's remaining claims should be dismissed because: (1) Goddard has failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act; (2) Goddard has failed to state a claim under the RLUIPA; (3) Goddard has failed to state a claim under the RFRA; (4) Goddard has failed to state a free exercise claim under the First Amendment; (5) Goddard has failed to state a retaliation claim; and (6) Defendants are entitled to qualified immunity. In the alternative, Defendants argue that they are entitled to summary judgment on all of Goddard's claims.

## II.    Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the plaintiff's complaint. *Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 364 (6th Cir. 2014).

When addressing a motion to dismiss, the Court views the complaint in the light most favorable to the plaintiff and accepts as true all 'well-pleaded facts' in the complaint. *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014). Because the plaintiff here is proceeding without the benefit of an attorney, the Court reads his complaint to include all fairly and reasonably inferred claims. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437-38 (6th Cir. 2012). In ruling on the motion to dismiss, the Court may also consider the documents attached to Goddard's complaint. *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017).

Here, Defendants moved both to dismiss and for summary judgment, attaching and relying upon declarations extrinsic to the pleadings in support of their motion. [R. 36]. Thus, the Court will treat Defendants' motion to dismiss the complaint as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F. 3d 1102, 1104 (6th Cir. 2010). *See also Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being requested, and the court's consideration as such is appropriate where the nonmovant submits documents and affidavits in opposition to summary judgment).

A motion under Rule 56 challenges the viability of another party's claim by asserting that at least one essential element of that claim is not supported by legally-sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). A party moving for summary judgment must establish that, even viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact and that the party is entitled to a judgment as a matter of law. *Loyd v. St. Joseph Mercy Oakland*, 766 F. 3d 580, 588 (6th Cir. 2014).

The Court reviews all of the evidence presented by the parties in a light most favorable to the responding party, with the benefit of any reasonable factual inferences which can be drawn in his favor. *Harbin-Bey v. Rutter*, 420 F. 3d 571, 575 (6th Cir. 2005). If the responding party's allegations are so clearly contradicted by the record that no reasonable jury could adopt them, the court need not accept them when determining whether summary judgment is warranted. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). If the applicable substantive law requires the responding party to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F. 3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F. 2d 1439, 1444 (6th Cir. 1993).

### A.    Motion for Discovery and Motion to Appoint Counsel

Before turning to the merits of Defendants' motion, the Court will address Goddard's motion for discovery pursuant to Fed. R. Civ. P. 56(d) [R. 45] and his motion to appoint counsel to assist with taking discovery. [R. 44]. Rule 56(d) states as follows:

> **(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> **(1)** defer considering the motion or deny it;
>
> **(2)** allow time to obtain affidavits or declarations or to take discovery; or
>
> **(3)** issue any other appropriate order

Fed. R. Civ. P. 56(d).

The trial court's allowance of additional discovery under Rule 56(d) (formerly Fed. R. Civ. P. 56(f)) is discretionary. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009). "The affidavit required by Rule 56(f) to support a request for additional discovery must indicate the need for discovery, what material facts may be uncovered, and why the information has not been previously discovered." *Id.* (citations omitted). As the Sixth Circuit has explained:

> It is not an abuse of discretion for the district court to deny the discovery request when the party "makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered." *Ironside v. Simi Valley Hosp.,* 188 F.3d 350, 354 (6th Cir.1999). It is also not an abuse of discretion to reject a Rule 56(f) affidavit as insufficient to support further discovery when the affidavit lacks "any details" or "specificity." *Emmons v. McLaughlin,* 874 F.2d 351, 357 (6th Cir.1989).

*Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004).

In his motion, Goddard identifies a list of topics on which he would like to take discovery, but does not offer any explanation as to how any of this information is necessary for him to present facts essential to justify his opposition to Defendants' motion for summary judgment. In the "affidavit" submitted in support of his motion, Goddard states: "I need this information to show that the Government has formed its own brand of Religion, identified it as Protestant, has removed any designation as a Christian, and prohibited any religious activity outside the governmental 'watchful eye.'" [R. 45-1]. However, Goddard fails to explain how the information that he claims to be seeking is relevant to the legal questions raised by Defendants' motion for summary judgment. Accordingly, he has failed to show that he cannot oppose Defendants' motion without taking the discovery he proposes. *United States v. One Harrington & Richardson Rifle*, 378 F.3d 533, 535 (6th Cir. 2004)(the affidavit must detail the discovery needed and demonstrate specific

reasons why the non-movant cannot oppose the summary judgment motion without additional discovery).

Moreover, Goddard's claimed "need" for this information in order to adequately respond to Defendants' motion is dubious, as he waited nearly six weeks after filing a 66-page response to Defendants' motion [R. 38, filed on September 13, 2017] to file his motion seeking discovery [R. 45, filed on October 24, 2017]. In fact, at no point in his lengthy response does Goddard indicate that he could not respond to any the arguments set forth by Defendants because he had not taken discovery. For both of these reasons, the Court will deny Goddard's motion for discovery [R. 45], as well as motion to appoint counsel to take this requested discovery [R. 44].

## III.    Analysis

### A.    Exhaustion of Administrative Remedies

Defendants first argue that Goddard's complaint must be dismissed because of his failure to properly exhaust his administrative remedies before filing this lawsuit as required by federal law. Under the Prison Litigation Reform Act of 1995 ("PLRA"), a prisoner may not bring an action under federal law with respect to prison conditions until all available administrative remedies are exhausted. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). Requiring exhaustion of remedies available within the agency whose actions are being challenged preserves the agency's administrative authority by providing the agency with "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). A prospective litigant must present their claim for relief in such a manner to "give the agency a fair and full opportunity to adjudicate their claims..." *Id.* at 90.

The BOP's Inmate Grievance System requires a federal prisoner to first seek informal resolution of any issue with staff, and then to institute a formal grievance with the warden within twenty days. 28 C.F.R. §§ 542.13, 542.14(a). If the prisoner is not satisfied with the warden's response, he or she must appeal to the appropriate regional office within twenty days, and if unsatisfied with that response, to the General Counsel within thirty days thereafter. 28 C.F.R. § 542.15(a). *See* BOP Program Statement 1300.16. Because "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules...," *Woodford*, 548 U.S. at 90, the prisoner must file the initial grievance and any appeals within these time frames.

The Sixth Circuit has made clear that a prisoner must take each of these steps and complete the entire prison grievance process before filing suit:

> While we recognize that plaintiff made some attempts to go through the prison's grievance procedures, we must dismiss plaintiff's complaint because he filed his federal complaint before allowing the administrative process to be completed. The plain language of the statute makes exhaustion a precondition to filing an action in federal court...The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit.

*Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (citations omitted).

Here, Defendants argue that Goddard failed to fully exhaust his First Amendment, RFRA, RLUIPA, and retaliation claims before filing this lawsuit. With respect to his religious claims (his First Amendment, RFRA, and RLUIPA claims), Goddard alleges that in April 2015, he submitted Form BP-AO822 (New and Unfamiliar Religious Components Questionnaire) requesting a Non-Protestant Christian service for followers of The Way. [R. 1 at p. 2]. In an attachment to this form, Goddard indicated that this form was a request "to no longer be designated in Sentry as Protestant." [R. 4] Goddard further requested that The Way be permitted to hold its own non-Protestant religious service at the prison on Sunday evenings, "a non-

protestant choir, an acceptable time to practice, to have our own guest speakers, [and] to have guest choirs (on occasion)," as well as to be provided with certain items for the religious services. [R. 1-1 at p. 9]

The prison's Religious Issues Committee ("RIC") met and considered Goddard's request. [R. 1-1 at 13, 18].  In response, a supervisory chaplain and the warden both wrote to Goddard and explained that "[t]he Religious practices described in this request are typically accommodated in the General Christian services, often referred to as Protestant."  [R. 1-1 at p. 13].  The response further explained that:

> The RIC recommends that participants be accommodated as individual practitioners when the existing congregational accommodations due [*sic*] not address distinctive beliefs.  Individual practitioners may procure religious study material, as guided by Program Statement 5266.10, Incoming Publications; and have access to clergy visits from their spiritual leader.  If an inmate does not wish to be listed in SENTRY with a religious preference of "Protestant," an appropriate alternative could be "Other."

[R. 1-1 at 13, 18].

Goddard was not satisfied with this response.  [R. 1 at 6].  After exchanging correspondence with chaplains at the prison, Goddard began to formally pursue his administrative remedies by filing a Form BP-9.  [R. 1-1 at p. 29].[2]  In this request (which was later assigned Remedy # 842133-F1 [R. 1-1 at p. 31]), Goddard complained that followers of the Way were not allowed equal access to the Chapel and further accused the BOP of being "diametrically opposed to Christianity," as shown, in part, by the BOP's policies prohibiting proselytizing in the prison. [R. 1-1 at p. 29].  Goddard also complained that prison chaplains had recently disbanded the choir or praise team.  [*Id*.].

---

[2] Apparently, Goddard's first attempt to file a formal administrative request failed, as he alleges that he first attempted to file this request as a "sensitive" BP-10, which would permit him to skip filing a BP-9 at the institutional level.  This request was returned with a rejection notice indicating that the request was not sensitive and directing Goddard to file a BP-9 at the institutional level. [R. 1 at p. 8].

Francisco Quintana, the Warden of FMC-Lexington, responded as follows:

> A review of your request has revealed numerous worship and study times for the General Christian faith tradition which you are part of. P.S. 53060.09 _Religious Beliefs and Practices_, section 11, B., states "In scheduling authorized religious activities, chaplains will consider both the availability of staff supervision and the need to share the time and space available among the eligible groups." Adding another General Christian Service would give General Christian's substantially more time than other faith groups.
>
> A lack of equitability in the allotment of time given to each faith group could lead to a disruption in the smooth orderly running of the institution and cause significant security concerns. If you find the current General Christian worship and study times do not meet your religious needs completely, you may practice your religion as an individual practitioner and may have a Minister of Record.

[R. 1-1 at 31].

On December 21, 2015, Goddard filed a Regional Administrative Remedy Appeal ("BP-10") with the Regional Director for the BOP's Mid-Atlantic Region. [R. 1 at p. 9].[3] This appeal was denied, although the narrative response to the appeal addressed only Goddard's request for an investigation into allegations of racially discriminatory actions leading to the disbanding of the Protestant Choir. [R. 1-1 at p. 35]. Regardless, the response indicated that it related to Remedy ID No. 842133-R1 and clearly states: "Your request for administrative remedy is denied." [R. 1-1, p. 35]. This response was dated January 7, 2016 and indicated that, if Goddard was dissatisfied with the response, he may appeal to the General Counsel, Federal Bureau of Prisons. [_Id._]. The response further directs that "[y]our appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534, within 30 calendar days of the date of this response." [_Id._]. Thus, to

---

[3]Rather than file a new BP-10, Goddard states that he filed the same BP-10 that he had previously attempted to submit as "sensitive." Thus, even though the copy of the BP-10 that he attaches to his Complaint as Exhibit Q has dates indicating that it was received in October 2015, Goddard's Complaint is clear that this is a copy of the BP-10 that he submitted in December 2015. [R. 1 at p. 9; R. 1-1 at p. 32-34].

be timely, the appeal must have been received by the Office of General Counsel by February 6, 2017.

Goddard claims that he mailed his Central Office Administrative Remedy Appeal ("BP-11") to the Office of General Counsel on February 1, 2016. [R.1 at p. 10]. In support of this claim, attached to his Complaint are a copy of a completed BP-11 form dated February 1, 2016 [R. 1-1 at p. 37], a certified mail receipt from Goddard to "General Counsel/Bureau of Prisons" with a handwritten postmark of "2/1/16" [R. 1-1 at p. 40-41], and a mail tracking report showing that the item arrived at Hub in Washington, D.C. on February 7, 2016 and was delivered at 8:45 a.m. on February 8, 2016. [R. 1-1 at p. 42].

Defendants submit evidence that, contrary to Goddard's allegation that he mailed an appeal to the General Counsel, Goddard's administrative remedy history maintained by the BOP does not indicate that an appeal was ever received for Remedy Identification No. 842133. [R. 36-1 at p. 6; R. 36-3 at ¶ 7, Att. B]. However, Defendants argue that, even construing the facts pled by Goddard in his favor, based on the allegations of Goddard's Complaint, his submission of the BP-11 was untimely because it was not received by the Office of General Counsel by February 6, 2016, as is required by the applicable regulations.

As Defendants point out, 28 C.F.R. § 542.18 states that an administrative "Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received." 28 C.F.R. § 542.18. This requirement is consistent with the directions to Goddard in the January 7, 2016 response, which clearly states that Goddard's appeal "must be *received* in the Administrative Remedy Section, Office of General Counsel...within 30 calendar days of the date of this response." [R. 1-1, p. 35 (emphasis added)]. Thus, Defendants argue that, even construing the facts in Goddard's favor, the General Counsel did not receive Goddard's appeal until after the

submission deadline. Accordingly, Goddard's appeal was untimely and he failed to exhaust his administrative remedies.

Goddard does not dispute that the evidence he submits shows that his appeal was not received by the Office of General Counsel by February 6, 2016. Rather, Goddard argues that his appeal was "submitted" for purposes of 28 C.F.R. § 542.15 when he mailed it on February 1, 2016. Essentially, he seeks to have the "prison mail box" rule apply to his administrative remedy filing, pursuant to which *pro se* prisoner court filings are deemed "filed" on the date the prisoner delivers the filing to prison authorities for mailing. *See generally Houston v. Lack*, 487 U.S. 266 (1988).

However, as pointed out by Defendants, Courts have declined to apply the prison mailbox rule in circumstances where statutory or regulatory schemes define what constitutes "filing." *See Smith v. Connor*, 250 F.3d 277, 279 (5th Cir. 2001)("*Houston* interpreted an undefined term in a federal rule of procedure; it did not announce a universal rule for prisoner filings. The Supreme Court has since emphasized that when the language of the governing rule clearly defines the requirements for filing, the text of the rule should be enforced as written.")(citing *Fex v. Michigan,* 507 U.S. 43, 52 (1993); *Nigro v. Sullivan,* 40 F.3d 990, 995 (9th Cir.1994)).

Here, 28 C.F.R. § 542.18 clearly provides that an appeal is considered "filed" on the date it is received. *See Baker v. Drew*, 2009 WL 2588905 at *4 (M.D. Ala. 2009) (finding that, because the definition of "filed" in 28 C.F.R. § 542.18 is unambiguous, the prison mailbox rule does not apply to save an administrative appeal mailed, but not received, before the deadline). Moreover, as explained by Program Statement 1330.18, Administrative Remedy Program, the submission deadlines provided by 28 C.F.R. § 542.15 "specify the date of the Appeal's receipt in the regional office or the Central Office." Program Statement 1330.18, Administrative Remedy Program (Jan.

6, 2014) at p. 7. The Program Statement further explains: "The deadlines have been made deliberately long to allow sufficient mail time. Inmates should mail their Appeals promptly after receiving a response to ensure timely receipt." *Id.* The BOP's Program Statements are internal agency guidelines that are "akin to...interpretive rules." Because they are not promulgated in full compliance with the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA") the Program Statements are entitled to "some deference," but only if they constitute a "permissible construction" of the statute under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995).

Although Goddard cites two unpublished district court opinions applying the prison mail box rule in the administrative remedy context, neither of these opinions address the significance of 28 C.F.R. § 542.18's definition of the term "filed". *See Cordoba v. Shartle*, 2010 WL 2572854 (N. D. Ohio 2010); *Vasquez v. Shartle*, 2011 WL 1004934 (N.D. Ohio 2011). In the absence of clear, binding authority directing that the prison mail box applies in the administrative remedy/appeal process, the Court is reluctant to apply the rule in this case. This finding is also consistent with both the BOP's internal regulations, as well with the directions to Goddard provided in Caraway's Response, clearly stating that Goddard's appeal "must be *received* in the Administrative Remedy Section, Office of General Counsel...within 30 calendar days of the date of this response." [R. 1-1, p. 35 (emphasis added)]. Thus, construing the facts in Goddard's favor, the Court finds that Goddard's appeal to the General Counsel was untimely and, accordingly, he failed to exhaust his administrative remedies. *See Woodford*, 548 U.S. at 83 (holding that a prisoner cannot "satisfy the Prison Litigation Reform Act's exhaustion

requirement...by filing an untimely or otherwise procedurally defective administrative grievance or appeal.")

Goddard's final argument is that, because February 6, 2016 fell on a Saturday, his filing deadline should have been extended to the next business day, which was Monday, February 8, 2016. However, the plain language of 28 C.F.R. § 542.15(a) requires an inmate to submit an appeal to the General Counsel "within 30 calendar days" of the date the Regional Director signed the response and does not extend that time period if the last day of the period is a Saturday, Sunday, or legal holiday. 28 C.F.R. § 542.15(a). Thus, Goddard's argument is without merit.

For all of these reasons, the Court finds that Goddard failed to fully exhaust his administrative remedies relating to his religious claims as required by 42 U.S.C. § 1997e(a).

With respect to Goddard's retaliation claim, Goddard's admits that he had not yet exhausted his administrative remedies with respect to this claim at the time this lawsuit was filed in his motion seeking to waive the exhaustion requirement with respect to this claim. [R. 6; R. 38 at p. 14]. While it is true that "the PLRA and Federal Rule of Procedure 15 permit a plaintiff to amend his complaint to add claims that were exhausted after the commencement of the lawsuit," this rule only applies "provided that the plaintiff's original complaint contained at least one fully exhausted claim." *Mattox v. Edelman*, 841 F.3d 583, 595 (6th Cir. 2017). Because the Court finds that Goddard had not fully exhausted his religious claims prior to filing this lawsuit, he may not rely on these claims to permit him to pursue an unexhausted retaliation claim.

Although Goddard's failure to exhaust his administrative remedies with respect to his claims warrant dismissal of his Complaint without prejudice, the Court further finds that, as more fully explained below, Goddard's claims also fail on substantive grounds. Thus, the Court will dismiss his Complaint with prejudice.

**B.      RLUIPA Claim**

Although Goddard attempts to bring a claim pursuant to the RLUIPA, the RLUIPA does not apply in this case.  The RLUIPA provides that "[n]o government shall impose a substantial burden of the religious exercise of a person residing in or confined to an institution,…even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person," first "is in furtherance of a compelling government interest," and second "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2).  For purposes of this statute, the term "government" is defined as state and local governments, their agencies and officials that are acting under color of state law. 42 U.S.C. § 2000cc-5(4)(A).  *See Holt v. Hobbs*, 135 S.Ct. 853, 859-860 (2015)(explaining that the RLUIPA and the RFRA are sister statutes, as the RLUIPA was enacted to apply to States and their subdivisions after the Supreme Court held in *City of Boerne v. Flores*, 521 U.S. 507 (1997) that Congress exceeded its powers in making the RFRA applicable to the States and their subdivisions).  *See also Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005)(noting that, in *City of Boerne*, the Supreme Court invalidated the RFRA as applied to States and their subdivisions).   Thus, the RLUIPA does not apply to the federal government or federal authorities.  *See Spiegelman v. Samuels*, 2015 WL 1411942 at *10 (E.D. Ky. 2015).  *See also Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008); *Benson v. Corrections Corp. of America*, 2009 WL 2461016 at *2 (N.D. Ohio 2009)("The RLUIPA does not apply to Federal prison inmates.").

Here, Goddard is in federal custody and all of the named Defendants are federal actors. Therefore, Goddard has failed to state a claim under the RLUIPA, as the plain language of the Act, as well as the Act's history, indicate that the Act applies only to State governments and

actors. Thus, Goddard's claims brought under the RLUIPA must be dismissed for failure to state a claim.

### C. RFRA Claim

Turning to Goddard's claim under the RFRA, the RFRA prohibits the federal government from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate that "application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b).

Thus, to establish a violation of the RFRA, Goddard must first show that the Government "substantially burdened" his exercise of religion. 42 U.S.C.A. § 2000bb-1(a); *United States v. Girod*, 159 F.Supp.3d 773, 772 (E.D.Ky. 2015). "Under RFRA, a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit...or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions..." *Navajo Nation*, 535 F.3d at 1069–70 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). *See also Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004)(interpreting the identical "substantial burden" standard of RLUIPA). However, "[a]n inconsequential or *de minimis* burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme. *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008)(citation omitted). *See also Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002)("A substantial burden must be more than an inconvenience."). Similarly, "a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying

some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." *Adkins* 393 F.3d at 569–70 (5th Cir. 2004)(interpreting the identical "substantial burden" standard of RLUIPA).

Here, Goddard has failed to show that the Defendants have substantially burdened his exercise of religion. Goddard is not being forced to choose between following the tenets of his religion and receiving a governmental benefit, nor is he being coerced to act contrary to his religious beliefs by the threat of civil or criminal sanctions. For example, this is not a case where the government is forcing Goddard to choose between his religious practices, such as growing a beard, and complying with prison regulations. *See Holt*, 135 S. Ct. at 862 (finding that a prison's refusal to allow an inmate to grow a beard substantially burdened his exercise of religion, as it forced him to choose between engaging in conduct that seriously violates his religious beliefs or facing serious disciplinary action). Nor is Goddard being denied a benefit, as Goddard is free to exercise his religion through participation in the General Christian service, or, if he is unsatisfied with the service available, as an "individual practitioner," pursuant to which he may procure religious study material and have access to clergy visits from his spiritual leader. There is no evidence that Goddard has ever been compelled to attend any religious service or that he has been denied any accommodations as an individual practitioner.

In response to Defendants' arguments that Goddard has failed to show that his exercise of religion has been substantially burdened, Goddard responds only with his previous criticisms of the "General Christian" services, that, despite the "General Christian" label, "it is a Protestant service" and Protestants "broke off from Catholicism, yet, still adhere to many of the Catholic practices, and pagan practices that the Plaintiff finds both offensive, abominable, and very un-Christian." [R. 38 at p. 20]. Goddard further argues that participation in the General Christian

service that is currently offered requires the acceptance of "homosexuality in the Choir, Catholics in the Choir, homosexuals and Catholics running the sound board, all manner of paganism, (Christmas, Easter, Lent, Palm Sunday, Good Friday)[, and the] false teaching by the so-called Chaplains, (saint and sinner, transubstantiation, that the wine and bread magically turn into the body and blood of Christ during communion)." [*Id*. at p. 21. *See also id*. at p. 39-41]. However, Goddard cites to no authority that the inclusion of prisoners in the service of whom Goddard does not personally approve constitutes a "substantial burden" on his own religious practices.

Goddard also overlooks the fact that, if he is not satisfied with the General Christian service, he may be accommodated as an individual practitioner and may procure religious study material and have access to clergy visits. As explained in a similar case by another court:

> Without more, a denial of group religious services in a prison environment, where security is a primary concern, does not demonstrate a substantial burden on the exercise of religion if inmates are allowed to receive religious material and to have visits from a minister. Maintaining order and security in a jail understandably provides jail personnel cause for concern whenever presented with the possibility of groups of prisoners congregating outside their cells. Further, because he was allowed to receive religious material and to have visits with a minister, [plaintiff] had alternate channels to practice his religion. Any burden caused by the denial of group services is offset by these reasonable opportunities to practice his religion. [Plaintiff] has presented no evidence that these alternatives were denied him. [Plaintiff] has therefore failed to demonstrate that a substantial burden was placed on his ability to practice his religion. Accordingly, the Court need not reach the issue of whether a compelling justification furthered by the least restrictive means has been put forth.

*Counts v. Newhart*, 951 F. Supp. 579, 590 (E.D. Va. 1996), *aff'd,* 116 F.3d 1473 (4th Cir. 1997).

Similarly, the Court finds here that Goddard has failed to establish that there has been a "substantial burden" on his exercise of religion. However, even if he had, Defendants have satisfied their burden of demonstrating that the "application of the burden to the person—(1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b).

Here, the interest identified by Defendants is maintaining order and safety in the prison. Specifically, Defendants argue that FMC Lexington "has a compelling government interest in offering a general Christian service based on the staffing limitations and space constraints within the Religious Services Department." [R. 36 at p. 20]. Indeed, Defendants have submitted evidence in the form of a Declaration of Thomas Caldwell, Chaplain at FMC-Lexington, stating that FMC-Lexington currently has approximately 1660 inmates designated to the facility. [R. 36-2, Caldwell Decl. at p. 2]. Caldwell further explains that the Religious Services Department currently offers congregate services for 15 designated religions, several of which contain sects or subsets of that particular religion and those sects all worship in one congregate service. [*Id*.]. Finally, he states that "all worship services at FMC-Lexington are open to any inmate, regardless of the inmate's professed faith or designated religious group." [*Id*.].

Certainly, in the prison context, maintaining order and safety is a compelling interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 369-70 (6th Cir. 2005); *Jones v. Shabazz*, 352 Fed. App'x. 910, 915 (5th Cir. 2009)(recognizing prison security problems, staffing limitations, and space constraints as compelling government interests). In interpreting the similar "compelling interest" requirements of the RLUIPA, the Supreme Court has explained that it does "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter* 544 U.S. at 722. The Court further explained:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, see *supra,* at 2118, "[c]ontext matters" in the application of that standard. *See Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of

> discipline, order, safety, and security in penal institutions. *See, e.g.,* 139
> Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that
> courts would apply the Act's standard with "due deference to the experience
> and expertise of prison and jail administrators in establishing necessary
> regulations and procedures to maintain good order, security and discipline,
> consistent with consideration of costs and limited resources." Joint
> Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. &
> Admin.News 1993, pp. 1892, 1899, 1900)."

*Id*. at 722-23.

Again, in *Holt* (also in the context of interpreting the similar provisions of the RLUIPA),
the Supreme Court pointedly emphasized "that although RLUIPA provides substantial protection
for the religious exercise of institutionalized persons, it also affords prison officials ample ability
to maintain security." *Holt*, 135 S.Ct. at 866. Moreover, the Sixth Circuit has specifically
cautioned against a district court substituting its judgment in place of the experience and expertise
of prison officials, instructing that, in interpreting the RFRA "courts must give due deference to
the judgment of prison officials, given their expertise and the significant security concerns
implicated by prison regulations." *Hoevanaar*, 422 F.3d at 370.

In this case, as noted above, the Court finds that Defendants' interest in maintaining order
and safety in the prison by scheduling religious services based on staffing limitations and space
constraints is compelling. The Court further finds that the regulation imposed by Defendants –
scheduling congregate services for several sects and subsets of each religion that are open to all,
while also permitting inmates to practice as "individual practitioners" to the extent that they feel
their individualized religious needs are not met in the available congregate services – is the least
restrictive means of attending to the religious needs of the prisoners, while also taking into
consideration the government's compelling interests in prison safety and security.

Because the Court finds that Goddard's religious exercise has not been "substantially
burdened" and, even if it had, Defendants' actions are the least restrictive means of furthering a

compelling governmental interest, Goddard has failed to state a claim under the RFRA. Accordingly, Goddard's RFRA claim will be dismissed.

### D. First Amendment Claim

Goddard is also pursuing a claim under Free Exercise clause of the First Amendment of the Constitution. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. Prisoners retain the right to the free exercise of their religion. *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985). But because "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs," when addressing a challenge to a prison regulation impacting religious expression a court must "balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons." *Id.*; *See also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987).

If a prison regulation substantially infringes on an inmate's First Amendment rights, "the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine the reasonableness of a prison regulation, the court considers several factors. First, there must be a rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Second, whether the regulation leaves open alternative means for prisoners to exercise their religious beliefs is relevant. Third, the court must account for the impact that permitting the prisoner to exercise his religious beliefs would have upon the rights of prison guards and other inmates and upon the allocation of scarce prison resources. Finally, a regulation is more likely reasonable if there are no other plausible alternative means to achieve its objectives. *Id*. at 89-90.

To be sure, given that the RFRA and the RLUIPA were enacted to provide more stringent protection to the exercise of religious conduct that the protection provided by the First Amendment Free Exercise Clause, the First Amendment provides less protection to Goddard's free exercise rights than the RFRA. *See Cutter*, 423 F.3d at 582 (RFRA provides more stringent protection of prisoners' free exercise rights than does the First Amendment, applying "strict scrutiny" instead of "reasonableness" ); *Holt*, 135 S.Ct. at 859-60 ("Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment."). Thus, because Goddard has failed to meet the RFRA's higher "strict scrutiny" standard of demonstrating a "substantial burden" to his religious exercise, he cannot meet the lesser "reasonably related" standard under the First Amendment, which affords him less protection. *Blanken v. Ohio Dept. of Rehabilitation and Correction*, 944 F.Supp. 1359, 1371 (S.D. Ohio 1996)(because the RFRA standard is higher than the First Amendment standard, if a plaintiff's RFRA claim fails as a matter of law, it follows that the plaintiff's First Amendment claim also fails).

Regardless, as explained above, the Court finds that the Defendants have a legitimate penological interest in maintaining order and security in the prison and this interest is reasonably related to its rejection of Goddard's request for a separate two-hour Sunday service for the followers of The Way, particularly given the open alternative means available for Goddard to practice his religion. Accordingly, Goddard's First Amendment claim must be dismissed.

In Goddard's Response, he suggests that he is also pursuing a claim under the Establishment Clause of the First Amendment. [R. 38 at p. 24-34]. However, his Complaint clearly states that his allegations are that "[t]he defendants have violated the Plaintiff's 1st, 8th, and 14th Amendment rights by denying him the right to freely exercise his religion known

originally as The Way, (Christianity)." [R. 1 at p. 17]. Indeed, in the Court's screening order, the Court made clear that Goddard was permitted to proceed with his First Amendment Free Exercise claim, not an Establishment Clause claim. [R. 21 at p. 5]. At no time has Goddard sought to amend his Complaint to add a claim under the Establishment Clause. Thus, despite his suggestion to the contrary in his Response to Defendants' Motion, Goddard does not have a claim under the Establishment Clause pending in this case.

However, even if Goddard had suggested an Establishment Clause claim in his Complaint, this claim would fail. The Supreme Court has stated that it "has long recognized that the government may...accommodate religious practices...without violating the Establishment Clause." *Cutter*, 544 U.S. at 713-714. Indeed, "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion...favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994)(citations and quotations omitted).

A policy does not offend the Establishment Clause of the First Amendment if it passes the three-pronged test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971): "First, the [governmental policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the [policy] must not foster 'an excessive government entanglement with religion.'" *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)(quoting *Lemon*, 403 U.S. at 612-613).

Here, clearly prison officials have a secular legislative purpose in maintaining order and security in the prison. As noted, FMC-Lexington currently has approximately 1660 inmates designated to the facility and offers congregate services for 15 designated religions, several of

which contain sects or subsets of that particular religion and those sects all worship in one congregate service. [R. 36-2, Caldwell Decl. at p. 2]. In light of these circumstances, the policy of offering a "general Christian service" based on the staffing limitations and space constraints within the Religious Services Department, while also offering the opportunity for individuals with distinctive beliefs to be accommodated as an "individual practitioner," cannot be said to either advance nor inhibit religion, nor does it foster an "excessive government entanglement" with religion. Notably, there is no suggestion that Goddard is being forced to attend any service. Rather, he may attend the available "general Christian" service if he wishes or he may be accommodated as an individual practitioner. The fact that a "general Christian" is offered does not suggest an endorsement of this religion, particularly in light of the fact that a variety of other religious services are offered in the prison and there is no evidence that the "general Christian" service is treated any differently than these other religious services that are offered. Thus, even if Goddard had alleged an Establishment Clause claim, this claim would fail.

### E.     Retaliation Claim

Goddard briefly states at the end of his complaint that the defendants have recently "begun to retaliate as [he] just filed another BP-9 over the fact the Chapel has refused to allow the Plaintiff and others continued use [of] the Chapel chairs for a Saturday night Bible Study that has gone on for over six years." [R. 1 at 17] Specifically, Goddard alleges that the defendants "have posted a sign on the Chapel door that chairs are for Chapel sponsored events only (though others use them), and asked Officers who work that post to cease opening the Chapel and allow chairs to be used." [R. 1 at 17].

Goddard brings his claim of First Amendment retaliation pursuant to *Bivens*, which permits civil rights claims to be brought against federal officials for unconstitutional conduct.

*Bivens*, 403 U.S. at 389. However, it is not clear whether such a claim is even cognizable under *Bivens*. Indeed, while the Supreme Court has expressly acknowledged the availability of the remedy for claims arising under the Fourth and Eighth Amendment, it has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001). In *Bush v. Lucas*, 462 U.S. 367 (1983), the Supreme Court held that a First Amendment retaliation claim was not cognizable under *Bivens*, although its conclusion was heavily dependent upon the availability of a comprehensive statutory regime available to the plaintiff. *Id*. at 387-89. Nonetheless, the Supreme Court has consistently expressed a hostility to the notion without clearly deciding the question. *Reichle v. Howards*, __ U.S. __, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)("For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment..., we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.")(citations omitted).

However, even assuming that *Bivens* does afford a remedy, Goddard's claim fails with respect to Defendants Quintana, Alexakos, and Hallock because Goddard's claims against these Defendants is based solely on their supervisory positions. While *Bivens* expressly validated the availability of a claim for damages against a federal official in his or her individual capacity, an officer is only responsible for his or her own conduct. *Ashcroft*, 556 U.S. at 676-677. *See also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1860 (2017). Thus, in order to recover against a given defendant in a *Bivens* action, the plaintiff "must allege that the defendant [was] personally involved in the

alleged deprivation of federal rights." *Nwaebo v. Hawk-Sawyer*, 83 F. App'x 85, 86 (6th Cir. 2003) (*citing Rizzo v. Goode*, 423 U.S. 362, 373-77 (1976)).

Here, Goddard fails to allege that Defendants Quintana, Alexakos and Hallock were personally involved in the alleged deprivation of his federal rights. At most, Goddard seeks to impose liability on these Defendants based on their respective responses to Goddard's administrative grievances. However**,** *Bivens* liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *Nwaebo v. Hawk-Sawyer*, 100 F. App'x 367, 369 (6th Cir. 2004)(citing *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999)). Such a claim seeks to impose liability upon a supervisor for his employees' conduct, a form of sweeping supervisory liability which is unavailable in a *Bivens* action: "[i]n a § 1983 suit or a *Bivens* action - where masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer." *Ashcroft*, 556 U.S. at 677 (2009). *See also Ziglar*, 137 S.Ct. at 1860. Thus, Goddard fails to state a First Amendment retaliation claim against Quintana, Alexakos and Hallock.

With respect Goddard's retaliation claim against the remaining Defendants whom he alleges engaged in retaliatory conduct (Hallock, Ortiz, and Mundy), to establish a claim of First Amendment retaliation, "a prisoner must prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Thaddeus–X v. Blatter,* 175 F.3d 378, 394, 398 (6th Cir.1999)(en banc)). Although retaliation can rarely be supported by direct evidence of the required intent, "conclusory allegations of retaliatory motive unsupported by material facts" are not sufficient to state a claim. *Harbin-Bey*

*v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005)(citations and quotation marks omitted). To establish causation, the plaintiff must set forth "a chronology of events from which retaliation may plausibly be inferred." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).

Here, Goddard's response explains that his "retaliation claim" relates to the halting of two Bible studies during leisure time. [R. 38 at p. 17]. According to Goddard, these Bible studies "began as long ago as 2007" and pre-dated Goddard's 2009 arrival at FMC-Lexington. [*Id.*] Goddard alleges that he filed his initial request regarding a separate service for The Way on April 19, 2015. [R. 1 at p. 2]. In his Complaint (filed on June 22, 2016), Goddard alleges that Defendants "have begun to retaliate as the Plaintiff just filed another BP-9 over the fact the Chapel has refused to allow the Plaintiff and others...use the Chapel chairs for a Saturday night Bible Study that has gone on for over six years." [R. 1 at p. 17]]. In subsequent motions seeking to amend his Complaint, Goddard clarified that the Bible study was halted sometime in October 2016. [R. 14 at p. 1; R. 18 at p. 2; R. 18-1 at p. 1-2, 4].

However, "[a] pure temporal relationship (A occurred after B) is not enough to establish a causal connection." *Coulson v. The Goodyear Tire & Rubber Co.*, 31 Fed. App'x 851, 859 (6th Cir. 2002). This is particularly true where, as here, over seventeen months passed between Goddard's request for a separate worship service on April 19, 2015 and the termination of the Bible study in October 2016. *See Vaughn v. Robb*, 2012 WL 769481 at *4 (W.D. Mich. 2012)(six week time period between prisoner's complaint and subsequent misconduct charge insufficient to establish the requisite causal link). As Goddard has failed to allege facts sufficient to support a reasonable inference of a causal connection between his conduct and the termination of the Bible study, his First Amendment retaliation claim fails.

### F.      Qualified Immunity

Defendants have further argued that, as no constitutional violation has occurred, they are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  As the Supreme Court explained in *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004), "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.*

When evaluating official immunity claims, the Sixth Circuit applies the following three-part test:  "First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(citation omitted).

The Court has concluded above that no constitutional violation occurred.  For this reason alone, Defendants are entitled to qualified immunity.  However, even continuing to the next step, the Court finds that any right that was purportedly violated was not "clearly established."  For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Shamaeizadeh v.*

*Cunigan*, 338 F.3d 535, 546 (6th Cir. 2003)(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)(other citation omitted). "In other words, the unlawfulness must be apparent under preexisting law." *Shamaeizadeh*, 338 F.3d at 546.

Here, although prisoners undoubtedly have First Amendment religious rights, courts have consistently held that these rights may be limited by the fact of incarceration, as well as by valid penological objectives, such as safety and security. *See Walker*, 771 F.2d at 929; *O'Lone*, 482 U.S. at 352. In light of these constitutionally permissible limitations on prisoner's First Amendment religious rights, the Court does not find that the contours of Goddard's rights in this context were sufficiently clear so that a reasonable official would understand that his actions violated Goddard's constitutional rights. Indeed, even where judges are in disagreement about what the law requires, it is unfair to subject a state official to damages "for picking the losing side in the controversy." *Pearson*, 555 U.S. at 245. For these reasons, Defendants are alternatively entitled to qualified immunity.

**IV.    Conclusion**

For all of the reasons set forth above, the Court finds that Goddard's Complaint [R. 1, 5, 11] must be dismissed, as not only failed to exhaust his administrative remedies before filing this lawsuit, but because he also fails to state a claim for which relief may be granted under the RFRA, the RLUIPA, the First Amendment or for retaliation. In the alternative, Defendants are entitled to qualified immunity.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1.    Goddard's motion to appoint counsel [R. 44] is **DENIED**.

2.    Goddard's motion for discovery [R. 45] is **DENIED**.

3. Defendants' motion to strike Goddard's response [R. 43] is **DENIED**. Goddard's response to Defendants' motion [R. 38] is accepted for filing and was considered in the course of reviewing the motion to dismiss or, in the alternative, motion for summary judgment.

4. The motion to dismiss, or in the alternative, motion for summary judgment filed by Defendants [R. 36] is **GRANTED**.

5. Goddard's complaint [R. 1] and first and second amended complaints [R. 5, 11] are **DISMISSED WITH PREJUDICE**.

6. All pending motions or requests for relief in this case, including Goddard's motion for preliminary injunction [R. 39], are **DENIED AS MOOT**.

7. This action is **STRICKEN** from the Court's active docket.

8. The Court will enter an appropriate Judgment.

Dated March 6, 2018.

Karen K. Caldwell

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY